IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| Misty Nalepa, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Civil Action No. 14-41 |
| | ) | |
| Jolley Industrial Supplies Company, Inc., | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

AMBROSE, Senior District Judge

## OPINION
## AND
## ORDER OF COURT

Plaintiff, Misty Nalepa ("Plaintiff" or "Nalepa"), initiated this action against her former

employer, Defendant Jolley Industrial Supplies Company, Inc. ("Defendant" or "Jolley"), alleging

discriminatory treatment on the basis of sex, hostile work environment, and retaliation in

violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq.* ("Title VII") and

the Pennsylvania Human Relations Act, 43 P.S. § 951, *et seq.* ("PHRA").

Pending before the Court is Defendant's Motion for Summary Judgment seeking

dismissal of Plaintiff's claims in their entirety. [ECF No. 22]. Plaintiff opposes Defendant's

Motion. After careful consideration of the parties' submissions, Defendant's motion is granted in

part and denied in part as follows.

## I. INTRODUCTION

### A. Factual Background

Unless otherwise indicated, the following material facts are undisputed.

### 1. Plaintiff's Employment History

Nalepa began her employment with Jolley in or around July 2010. Nalepa initially was

hired for an inside sales position but was moved to an outside sales position shortly thereafter. Donald Pletcher began employment at Jolley in October 2010. Pletcher's employment agreement dated November 2010 lists his job title as Vice President of Sales. [ECF No. 33-7, Jolley 00147]. Pletcher testified in his deposition that he had control over all of the salespeople during his employment at Jolley, and that he supervised the sales employees, including Nalepa. Pletcher Dep. [ECF No. 25-2], at 15, 27-29. Nalepa agrees that Pletcher was her supervisor during her employment.

In December, 2010, the owners of the company, Richard and Ann Jolley, announced their retirement from the day-to-day management of the company. [ECF No. 33-7, Jolley 00166-00169]. In a memo to "Jolley Industrial Management and Staff" dated December 30, 2010, the Jolleys stated that "[e]ffective January 1, 2011, Nick Pici will assume the position of CEO . . . and Don Pletcher will be assuming the position of COO . . . . Combined, they will be responsible for the day to day operations of Jolley Industrial Supply Company." Id.[1] Despite this memo, Pletcher testified that his title as COO was unofficial, and he denies that he ever operated as the COO. Pletcher Dep., at 24, 29-30. Plaintiff disagrees with Pletcher's testimony, and cites, inter alia, the December 2010 Jolley memo, Pletcher's LinkedIn profile, and a February 2011 memo from Nick Pici, as evidence that Pletcher held himself out as Jolley's COO. [ECF No. 33-7, Jolley 00166-00170; ECF No. 33-12].

Pletcher testified that Jolley was a small company and did not have a human resources department or human resources person. Pletcher Dep. at 25. He stated that as for human resources, "probably the best thing there would have been Carolyn Andrusky, and she was actually the controller." Id. at 26. Pletcher said that Andrusky was the one who kept all of the records of vacation dates, insurance, and personal information. Id.; see also Affidavit of Carolyn Andrusky ¶ 3 [ECF No. 25-5].

---

[1] Nicholas Pici is now deceased and thus was not deposed in connection with this lawsuit.

Jolley contends that during the time of the events alleged in Nalepa's Complaint, the company had an employee handbook that contained a policy against sexual harassment. A copy of that handbook is attached as Exhibit 2 to Nalepa's deposition. [ECF No. 25-1, Ex. 2]. The handbook is dated January 1, 2006, and the Policy Against Harassment is set forth in Section 4.D. See id. The record also contains a document entitled "Receipt of Employee Handbook" that Nalepa signed and dated on July 13, 2010, indicating that she had "received and read the Jolley employee handbook and clearly underst[oo]d its contents." Nalepa Dep. [ECF No. 25-1], at 33-34, and Ex. 3. Nalepa admits signing this document but testified that she never received or read the handbook at that time and never saw the handbook or sexual harassment policy while employed. Nalepa Dep. at 33-34. She stated that she was told to sign the document and that Jolley would provide a copy later, but that the company never did so. Id. Among other things, the handbook's Policy Against Harassment stated:

> If you believe that you are being harassed by another employee, you should immediately notify your supervisor. If you do not feel that the matter can be discussed with your supervisor, you should contact a Manager to discuss your complaint. You may be assured that you will not be penalized in any way for reporting a harassment problem.

> All complaints of unlawful harassment which are reported to management will be investigated as promptly as possible, consistent with the need to conduct an adequate investigation . . . .

Nalepa Dep. Ex. 2, at 6.

### 2. Alleged Harassing Behavior and Resignation from Employment

Nalepa testified that in late 2011, Pletcher began texting and calling her for personal reasons and continued to do so for five or six months until she resigned in April 2012. Nalepa Dep. [ECF No. 25-1], at 38. The record contains copies of these text messages for the last month of Nalepa's employment (March 28, 2012-April 25-2012). Id., Ex. 4. Nalepa testified that the Jolley Blackberry that she used to send the text messages had automatically deleted any earlier texts. Id. at 40; see also ECF No. 33-6 (spreadsheet prepared by Precise, Inc., showing

all data retrieved from Nalepa's Blackberry).

Nalepa contends that in the texts, phone calls, and in person, Pletcher often commented on her appearance. See, e.g., ECF No. 25-1, Ex. 4, 000274 ("Hey also looking good today."); id. 000146 ("U by far are the craziest cutest and I can't explain what else but one of a kind. By the way u looked fabulous today."); id. 000139 ("I can honestly say u are most amazing unique strongest. And your looks are just a bonus."). Nalepa further contends that, in some of the texts, Pletcher implied he wanted to see her in a "sundress" and told her that a song about a girl in blue jeans reminded him of her. See id. 000241-000242, 000246. She also points to a series of texts in which Pletcher repeatedly asked her to send him a picture of her new haircut, which she refused to do. See id. 000232, 000230, 000229, 000225, 000224, 000205, 000204, 000203, 000191, 000188. When Pletcher later saw her haircut at work, he texted her about it, saying "Have a good day mist and hair looks amazing was worth wait but not really lol." Id. 000186. Later that same night, he texted, "Hey sweet dreams misty dawn talk to ya tomorrow. And one more time hair giving butt run for money in dreams. Lol." Id. 000173. In another text, Pletcher referred to Nalepa as a "hottie." Id. 000170 (". . . made sure I wished some hottie sweet dreams."). Jolley admits that Pletcher sent the text messages in question but states that Nalepa never indicated to Pletcher that she thought his conduct was offensive or unwelcome and denies that the text messages are evidence of unlawful sexual harassment.

In addition to the text messages, Nalepa complains that Pletcher engaged in other harassing conduct, including accompanying her on sales calls to spend time with her and giving her a bonus only to insist she accompany him to a casino to spend it. Nalepa Dep. at 40-43, 48-50; Pletcher Dep. [ECF No. 25-2], at 63-64. She also recounts an incident where she claims that she forwarded Pletcher a sexually explicit and harassing e-mail she had received from a client and that he responded only "hahahahahahaha." See ECF No. 33-11; Pletcher Dep. at 71-73. Nalepa recalls another occasion on which Pletcher threw a pen at her because he was

angry that she was avoiding him and not replying to his texts. Nalepa Dep. at 103. Jolley denies Nalepa's version of events, citing Pletcher's testimony that he accompanied other employees on sales calls as well; that Nalepa refused his offer to address the e-mail issue; and that they went to the casino together as friends. ECF No. 37 (Def.'s Resp. to Pl.'s St. Mat. Facts) ¶¶ 11-16. Jolley does not deny that Pletcher threw a pen at Nalepa, but states that Pletcher was not angry at Nalepa at the time that alleged incident occurred. Id. ¶ 40.

Nalepa contends that from March 28, 2012-April 7, 2012, Pletcher texted her numerous times, including every morning when she awoke or at bedtime, or both, and that he became annoyed or angry if she did not respond. See Pl.'s Additional Concise Statement of Material Facts [ECF No. 32] ¶¶ 17-42 (quoting text messages with citation). During a text exchange on April 5, 2012, Pletcher texted Nalepa, "[U] are the most amazing woman I ever met but ur the only woman who doesn't give in at all." Nalepa Dep. Ex. 4, 000139-000141. Nalepa texted back "Ur wife should be the most amazing goof." Id. Pletcher replied, "I can honestly say u are most amazing unique strongest[.] And ur looks are just a bonus." Id.

During this same April 5, 2012 text exchange, Nalepa told Pletcher that she was dating someone named Eric and that she was "going to give him [Eric] a chance which means u [Pletcher] will have to behave urself [sic]." Nalepa Dep. Ex. 4, 000135. Nalepa testified that she told Pletcher about Eric so that he would get the hint to stop texting her and commenting about her. Nalepa Dep. at 108-09. Pletcher, however, continued to text Nalepa throughout the day on April 5, expressing what Nalepa perceived as disappointment that she was dating another man. See id. 000114-000134. At one point, Pletcher asked "What the heck am I supposed to say[?]" to which Nalepa responded, "Something along those lines . . . Thought u were suppose[d] to be happy for me at least most friends would be. I mean it's pretty cool that he asked my dad and got his [p]ermission 1st that's respectable." Id. 000132. Pletcher replied, "Yup ain't got nutin [sic] for that. Told ya I was dumb just didn't know how dumb lol." Id.

000131. Later that evening, Nalepa texted, "Ok so we can't still be friends considering that's all we were?" Id. 000116. Pletcher texted back as follows: "Considering it must have been all me telling u how great u were and how hot and how perfect it's easy for u." Id. Nalepa responded "What r u saying Don? Really! Stop talking circles!" Id. 0000115. Pletcher replied, "Mist I'm not talking circles[. I]f any person saw how we got along and read our texts doubt they would think I'm being crazy. Wouldn't u agree[?]" Id. At that point, Nalepa ended the text exchange, typing "TTYL [talk to you later]." Id. 000114.

On the morning of April 6, 2012, Pletcher texted Nalepa a good morning message and asked if she had thought about what he had said the day before. Id. 000113-000114. Although Nalepa responded that she did not want to talk about it because "none of it makes sense," Pletcher continued to text her. Id. 000109-000114. At 12:57 p.m. on April 6, Nalepa informed Pletcher that she was resigning her employment. Id. 000107-000109. Nalepa testified that, at this point, she realized Pletcher was not going to stop the way he was behaving and so she decided to resign. Nalepa Dep. at 119-20.

After receiving Nalepa's texts about resigning, Pletcher asked her to reconsider. Nalepa Dep. at 120-121 & Ex. 4, 000105-000108. Nalepa testified that she talked to Pletcher on the phone during the afternoon of April 6 and told him that she was upset with him continually texting her and commenting on her appearance. Id. at 120-23. She claims that Pletcher promised to keep their relationship strictly professional and that, on the basis of this promise, she agreed to think about reconsidering her decision to resign. Id. at 122-23; see also Def.'s Concise Statement of Material Facts ¶ 54 (admitting Pletcher promised Nalepa he would keep the relationship more "professional"). The next morning, a Saturday, Pletcher sent Nalepa a text that said, "Hey hope u had a great night and u and boys have [a] good day are u egg hunting[?]" Nalepa Dep. Ex. 4, 000104. Nalepa testified that she considered this text an inappropriate personal question after Pletcher's promise to keep things strictly professional.

Nalepa Dep. at 128-30. After receiving this text, Nalepa texted back that she had "thought about it a lot" and she was sticking to her initial decision to resign. Nalepa Dep. Ex. 4, 000104. On the morning of April 9, 2012, Nalepa confirmed to Pletcher that she was resigning. Nalepa admits that she was never threatened with termination by anyone at Jolley, including Pletcher.

## B. Procedural History

On or about September 26, 2012, Nalepa filed charges of discrimination against Jolley with the Equal Employment Opportunity Commission ("EEOC"), alleging unlawful sexual harassment, discrimination, and retaliation. These charges were cross-filed with the Pennsylvania Human Relations Commission ("PHRC"). By letter dated November 15, 2013, the EEOC notified Nalepa of her right to file a civil action against Jolley, and over one year has passed since Nalepa filed her charge with the PHRC.

On February 10, 2014, Nalepa filed her Complaint against Jolley. [ECF No. 1]. On April 8, 2010, Jolley filed its Answer to Nalepa's Complaint. [ECF No. 6]. On April 23, 2015, Jolley filed the instant Motion for Summary Judgment and supporting materials. [ECF Nos. 22-25]. On June 22, 2015, Nalepa filed a Response to Jolley's Concise Statement of Material Facts, a Counter Concise Statement of Material Facts, Exhibits, and a Response in Opposition to Jolley's Motion. [ECF Nos. 30-33]. Jolley filed a Reply Brief to Nalepa's Opposition and a Response to Nalepa's Concise Statement of Material Facts on July 10, 2015. [ECF Nos. 36-37]. The Motion is now ripe for my review.

## II. LEGAL ANALYSIS

### A. Standard of Review

Summary judgment may only be granted if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). Rule 56 mandates the entry of summary judgment, after

adequate time for discovery and upon motion, against the party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).

In considering a motion for summary judgment, this Court must examine the facts in a light most favorable to the party opposing the motion. Int'l Raw Materials, Ltd. v. Stauffer Chem. Co., 898 F.2d 946, 949 (3d Cir. 1990). The burden is on the moving party to demonstrate that the evidence creates no genuine issue of material fact. Chipollini v. Spencer Gifts, Inc., 814 F.2d 893, 896 (3d Cir. 1987). The dispute is genuine if the evidence is such that a reasonable jury could return a verdict for the non-moving party. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A fact is material when it might affect the outcome of the suit under the governing law. Id. Where the non-moving party will bear the burden of proof at trial, the party moving for summary judgment may meet its burden by showing that the evidentiary materials of record, if reduced to admissible evidence, would be insufficient to carry the non-movant's burden of proof at trial. Celotex, 477 U.S. at 322. Once the moving party satisfies its burden, the burden shifts to the non-moving party, who must go beyond its pleadings, and designate specific facts by the use of affidavits, depositions, admissions, or answers to interrogatories showing that there is a genuine issue for trial. Id. at 324. Summary judgment must therefore be granted "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." White v. Westinghouse Elec. Co., 862 F.2d 56, 59 (3d Cir. 1988) (quoting Celotex, 477 U.S. at 322).

**B.  Sexual Harassment – Hostile Work Environment – Title VII and PHRA[2]**

Nalepa alleges that Jolley created and condoned a hostile work environment resulting in constructive discharge, in violation of Title VII and the PHRA.  Jolley argues that it is entitled to summary judgment as to Nalepa's hostile work environment claim because Nalepa cannot establish that the alleged harassing conduct was severe or pervasive within the meaning of Title VII or that the alleged conduct detrimentally affected Nalepa and/or would detrimentally affect a reasonable person in like circumstances.   For the reasons set forth below, I disagree.

To establish a hostile work environment claim against an employer, a plaintiff must establish the following:  (1) the employee suffered intentional discrimination because of his or her sex; (2) the discrimination was severe or pervasive; (3) the discrimination detrimentally affected the plaintiff; (4) the discrimination would detrimentally affect a reasonable person in like circumstances; and (5) the existence of *respondeat superior* liability.  Mandel v. M&Q Packaging Corp., 706 F.3d 157, 167 (3d Cir. 2013).    The first four elements establish a hostile work environment, and the fifth element determines employer liability.  Id.

 As the Supreme Court has explained, "the prohibition of harassment on the basis of sex requires neither asexuality nor androgyny in the workplace; it forbids only behavior so objectively offensive as to alter the 'conditions' of the victim's employment.  'Conduct that is not severe or pervasive enough to create an objectively hostile or abusive work environment – an environment that a reasonable person would find hostile or abusive – is beyond Title VII's purview.'"  Oncale v. Sundowner Offshore Servs., Inc., 523 U.S. 75, 81 (1998) (quoting Harris v. Forklift Sys., Inc., 510 U.S. 17, 21 (1993)).  Courts regard this "requirement as crucial, and as sufficient to ensure that courts and juries do not mistake ordinary socializing in the workplace – such as male on male horseplay or intersexual flirtation – for discriminatory 'conditions of

---

[2]  My analysis of Nalepa's Title VII claims applies equally to her claims under the PHRA.  Kelly v. Drexel Univ., 94 F.3d 102, 105 (3d Cir. 1996).

employment.'" Id.; see also Brown-Baumbach v. B&B Auto., Inc., 437 F. App'x 129, 133 (3d Cir. 2011) ("[N]ot every sexual comment, action or joke creates a hostile work environment."); Weston v. Pennsylvania, 251 F.3d 420, 428 (3d Cir. 2001) ("The mere utterance of an epithet, joke, or inappropriate taunt that may cause offense does not sufficiently affect the conditions of employment to implicate Title VII liability."), abrogated on other grounds as rec'd by Burlington N. & Santa Fe Ry. Co. v. White, 548 U.S. 53 (2006). To determine whether an environment is hostile, courts must consider the totality of the circumstances, including "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." Mandel, 706 F.3d at 168 (quoting Harris, 510 U.S. at 23); see also Caver v. City of Trenton, 420 F.3d 243, 262-63 (3d Cir. 2005) ("[A] discrimination analysis must concentrate not on individual incidents, but on the overall scenario.").

In this case, Jolley does not dispute that the alleged harassment was due to Nalepa's sex. Jolley contests, however, whether the harassment was severe or pervasive; whether the harassment detrimentally affected Nalepa; and whether the harassment would detrimentally affect a reasonable person in like circumstances. I address each of these points in turn.

### 1. Severe or Pervasive

Although Jolley admits that Pletcher's text messages to Nalepa were "flirtatious" and "inappropriate," it argues that Pletcher's alleged behavior nevertheless was not sufficiently severe or pervasive to establish Title VII liability. Def.'s Br. Supp. [ECF No. 23] at 6-11. In support, Jolley compares Pletcher's alleged conduct to conduct found legally insufficient in a number of other cases. See id. As Nalepa points out in her response, however, Jolley cites primarily non-binding caselaw; frequently misstates the holdings of these cases; and/or neglects to point out key distinguishing facts.

For example, Jolley misleadingly cites LaRose v. Philadelphia Newspapers, Inc., 21 F.

Supp. 2d 492 (E.D. Pa. 1998), aff'd, 205 F.3d 1329 (3d Cir. 1999), and Koelsch v. Beltone Electronics Corp., 46 F.3d 705, 708 (7th Cir. 1995), as examples of cases that held conduct allegedly "far more egregious" than Pletcher's to be insufficiently severe or pervasive under Title VII. Def.'s Br. [ECF No. 23] at 6-7. As Nalepa's opposition brief notes, however, the pertinent issue in LaRose and Koelsch was not the merits of the plaintiffs' hostile work environment claims, but whether those claims were time-barred. See LaRose, 21 F. Supp. 2d at 497-500 (holding that the most severe conduct alleged by the plaintiff – that her supervisor groped her at work, gave her a sexually explicit "coupon," and made other jokes, comments, and advances of a sexual nature – took place over ten years before she filed her PHRC complaint, and, therefore, was barred as untimely); Koelsch, 46 F.3d at 707-08 (no nexus between company president's two advances toward the plaintiff and alleged sexually suggestive joking to support application of continuing violation theory).[3]

Similarly, Jolley cites Gares v. Willingboro Twp., 90 F.3d 720, 723-24 (3d Cir. 1996), for the proposition that the Court of Appeals for the Third Circuit found no hostile work environment where a supervisor called the plaintiff a "slut" and "tramp," touched her, described her breasts as "bazooka size," and laughed at a "joke" that a noise was actually her "dildo." Def.'s Br. Supp. at 7. Jolley's assertions, however, grossly misstate the Gares court's holding. As Nalepa explains, the Court of Appeals in Gares actually affirmed the *denial* of the township's motion for judgment as a matter of law *after* a jury awarded the plaintiff compensatory *and* punitive damages for the alleged conduct. Gares, 90 F.3d at 722; see also id. at 724 ("[B]y his own affirmative conduct, and by tolerating and encouraging similarly offensive conduct [by] other male employees against Gares and her female co-workers, Captain Owens created and

---

[3] In its Reply Brief, Jolley notes that the Koelsch court further stated that "even if" timeliness was not an issue, the plaintiff's allegations did not reflect an unlawful hostile work environment. Def.'s Reply Br. [ECF No. 36] at 1-2. Even if I were to consider this *dicta* from another Circuit as controlling, the alleged harassing behavior in Koelsch – two isolated advances by the company president and two unrelated incidents of sexually suggestive jokes by others in the workplace – is simply too dissimilar to the alleged misconduct in this case to support an award of summary judgment.

fostered a sexually hostile work environment.").  In its Reply Brief, Jolley bizarrely attempts to rectify its admittedly erroneous reading of Gares by claiming it intended to illustrate the "unmistakable contrast" between the Gares facts and the facts alleged by Nalepa.  Reply Br. [ECF No. 36] at 2.  Even if I ignore the disingenuous nature of this response, Jolley's "new" interpretation of Gares fails to dictate an award of summary judgment in this case.  Nothing in Gares indicates that the Court viewed the alleged behavior as a "floor" that would render any lesser behavior insufficiently severe or pervasive as a matter of law.  To the contrary, the Gares court affirmed the jury's punitive damages award because the harassing conduct at issue was "especially egregious."  90 F.3d at 732-33.

The remaining cases on which Jolley relies are nonbinding and/or too factually dissimilar to warrant the entry of summary judgment under the "severe or pervasive" element.  See, e.g., DeCesare v. Nat'l R.R. Passenger Corp., No. CNA 98-3851, 1999 WL 330258 (E.D. Pa. May 24, 1999), aff'd, 254 F.3d 1077 (3d Cir. 2001) (unreported case granting summary judgment on "severe or pervasive" prong where plaintiff alleged five discrete instances of harassing behavior by a foreman, including one instance in 1995 and four instances in Fall 1996; court noted that the foreman made sexual remarks on only one occasion and that the conduct was not frequent, repeated, or persistent); Carroll v. Acme Truck Line, Inc., 992 F. Supp. 2d 512 (W.D. Pa. 2014) (severe or pervasive conduct not found in district court case involving allegedly harassing text messages; alleged harasser reported to plaintiff; plaintiff was employed by defendant for only three months; plaintiff only worked out of the same building as harasser on five occasions; alleged violent outbursts were unrelated to plaintiff's sex); Stevens v. St. Elizabeth Med. Ctr., 533 F. App'x 624 (6th Cir. 2013) (unpublished Sixth Circuit opinion affirming summary judgment in favor of employer despite evidence of allegedly harassing text messages; text messages were neither offensive nor vulgar; messages from alleged harasser occasionally expressed continued affection for plaintiff with whom he had just ended a consensual affair; plaintiff

expressed a desire to continue working with alleged harasser).[4]  Indeed, two Third Circuit appellate cases that Jolley cites actually counsel against granting summary judgment in this case.  See Brown-Baumbach v. B&B Automotive, Inc., 437 F. App'x 129, 133-34 (3d Cir. 2011) (both sexually offensive and facially neutral comments and workplace conduct, combined with their frequency over a four-month span, created genuine issues of material fact precluding summary judgment); Mandel v. M & Q Packaging Corp., 706 F.3d 157 (3d Cir. 2013) (reversing grant of summary judgment on hostile work environment claim, holding that district court improperly parsed out each event and viewed them separately, rather than as a whole, in determining whether conduct was severe or pervasive).

Although other cases are helpful guides as to how to apply the law, each case ultimately turns on its own unique facts.  Considering the case at hand in light of the totality of the circumstances, I find that genuine issues of material fact exist as to whether Pletcher's alleged conduct was "severe or pervasive" within the meaning of Title VII.  These facts include many of the bullet points set forth in Nalepa's opposition brief, including the content and frequency of text messages from Pletcher over an alleged period of 5-6 months; Nalepa's attempts to dissuade Pletcher's advances and comments; Pletcher's anger if Nalepa refused his advances or failed to respond to his texts; and workplace incidents such as Pletcher throwing a pen at Nalepa.  Pl.'s Br. Opp. [ECF No. 30] at 10-11.

### 2.  Detrimental Effect

Jolley argues that there is no evidence that Pletcher's alleged conduct detrimentally affected Nalepa or would have detrimentally affected a reasonable person in like circumstances.  Def.'s Br. at 11-13.  Specifically, Jolley claims that the record shows that Nalepa was an active, willing participant in the conduct at issue.  See id.  The Court of Appeals for the Third Circuit,

---

[4] Again, whether careless or deliberately misleading, Jolley represents Stevens to be a Third Circuit case. Def.'s Br. At 10-11.  As an unpublished opinion out of the Court of Appeals for the Sixth Circuit, Stevens is not binding here.

however, has cautioned against leaping to such conclusions at the summary judgment stage:

> Although [plaintiff] engaged in certain unprofessional conduct, the comments and conduct to which she was subject were often worse and apparently uninvited. . . . A jury could reasonably conclude that [plaintiff] did not invite these comments or conduct and that, despite her own conduct, was offended by them. Because the inherently subjective question of whether particular conduct was unwelcome presents difficult problems of proof and turns on credibility determinations, the District Court erred in granting summary judgment.

Mandel, 706 F.3d at 168-69. Jolley's repeated references to Nalepa's behavior, dismissal of their correspondence as merely "friends texting," and characterization of Pletcher's behavior as mere "jealousy" are examples that highlight the factual disputes inherent in this case and implicate the same concerns the Court of Appeals voiced in Mandel. Jolley also ignores Nalepa's testimony that she feared retaliation from Pletcher, her superior, if she rejected or offended him and that Pletcher's advances caused her great distress eventually prompting her to resign.[5]

In short, whether Pletcher's alleged conduct detrimentally affected Nalepa or would detrimentally affect a reasonable person in like circumstances, turns on factual disputes inappropriate for resolution at the summary judgment stage. Thus, Jolley's motion for summary judgment is denied on this point.

### C. Constructive Discharge

The Supreme Court has held that Title VII encompasses employer liability for constructive discharge. Pa. State Police v. Suders, 542 U.S. 129, 142-43 (2004). "Under the constructive discharge doctrine, an employee's reasonable decision to resign because of unendurable working conditions is assimilated to a formal discharge for remedial purposes." Id. at 142. "The inquiry is objective: Did working conditions become so intolerable that a reasonable person in the employee's position would have felt compelled to resign?" Id.

---

[5] To the extent Jolley insinuates that Nalepa could not have found Pletcher's conduct to be unwelcome because she had engaged in a consensual relationship with a prior supervisor, such suggestion is offensive and warrants no further response.

Successfully establishing a hostile work environment claim is not in itself sufficient to show constructive discharge. Rather, "[a] hostile-environment constructive discharge claim entails something more: A plaintiff who advances such a compound claim must show working conditions so intolerable that a reasonable person would have felt compelled to resign." Id. at 146-47; see also Spencer v. Wal-Mart Stores, Inc., 469 F.3d 311, 316 n.4 (3d Cir. 2006) ("To prove constructive discharge, the plaintiff must demonstrate a greater severity or pervasiveness of harassment than the minimum required to prove a hostile working environment." (internal quotations omitted)). The test for constructive discharge is an objective one and, therefore, "an employee's subjective perceptions of unfairness or harshness do not govern." Mandel, 706 F.3d at 169. In determining whether an employee was forced to resign, courts consider a number of factors, including "whether the employee was threatened with discharge, encouraged to resign, demoted, subject to reduced pay or benefits, involuntarily transferred to a less desirable position, subject to altered job responsibilities, or given unsatisfactory job evaluations." Id. at 169-70 (citing Colwell v. Rite Aid Corp., 602 F.3d 495, 503 (3d Cir. 2010)); see also Clowes v. Allegheny Valley Hosp., 991 F.2d 1159, 1161-62 (3d Cir. 1993) (setting forth non-exhaustive list of factors that can indicate constructive discharge).

After careful consideration, I agree with Jolley that, even when viewed in the light most favorable to Nalepa, the evidence is insufficient to create a jury question as to constructive discharge. As Jolley notes, Nalepa admits that she was never threatened with termination or demotion by anyone at Jolley, including Pletcher; she was never threatened with a transfer; and she never received a bad review. See ECF No. 31 ¶¶ 57-61. Likewise, there is no evidence that Nalepa's job responsibilities were altered or that her pay and/or benefits were reduced. Although Nalepa is correct that these factors are not dispositive of a constructive discharge claim, she offers no other evidence, other than her own subjective perceptions, that would elevate her claim beyond an ordinary hostile work environment claim and from which a jury

could conclude that Nalepa's working conditions were so intolerable that a reasonable person would feel compelled to resign.  See Suders, 542 U.S. at 147 ("[U]nless conditions are beyond 'ordinary' discrimination, a complaining employee is expected to remain on the job while seeking redress." (quoting Perry v. Harris Chernin, Inc., 126 F.3d 1010, 1015 (7th Cir. 1997))).[6]

 For these reasons, Jolley's motion for summary judgment on Nalepa's constructive discharge claim is granted.[7]

### D. *Respondeat Superior* Liability

Before Nalepa's hostile work environment claim can proceed to a jury, I must address *respondeat superior* liability.  In Burlington Indus., Inc. v. Ellerth, 524 U.S. 742 (1998) and Faragher v. Boca Raton, 524 U.S. 775 (1998), the Supreme Court set forth a framework for determining employer liability in Title VII cases alleging workplace harassment.  See Vance v. Ball State Univ., 133 S. Ct. 2434 (U.S. 2013).  The basis of an employer's liability for a hostile work environment under this framework depends on whether the harasser is the victim's supervisor or coworker.  See Mandel, 706 F.3d at 169.   Under Faragher/Ellerth, an employer is vicariously liable for harassment by a supervisor when the supervisor "takes a tangible employment action."  Vance, 133 S. Ct. at 2441-42.  The Supreme Court defined a "tangible employment action" as "a significant change in employment status, such as hiring, firing, failing

_____

[6] The cases Nalepa cites in support of her constructive discharge claim all involve facts more egregious than those supported by the evidence in this case.  See, e.g., Aman v. Cort Furniture Rental Corp., 85 F.3d 1074, 1084 (3d Cir. 1996) (plaintiff endured six years of continuous discrimination; was told she would be written up and other employees were instructed to compile complaint lists against her; was yelled at in front of her supervisor and other employees; and was accused of not doing her job properly); Owens v. Allegheny Valley Sch., 869 F. Supp. 2d 653, 662-63 (W.D. Pa. 2012) (denial of motion to dismiss; plaintiff alleged, inter alia, he was denied opportunities for extra work not afforded to white employees and was forced to perform demeaning tasks).

[7] Just as the statement of a hostile work environment claim does not ensure the survival of a concomitant constructive discharge claim, the failure to establish constructive discharge is not fatal to a hostile work environment cause of action.  See Spencer, 469 F.3d at 316 (Title VII permits recovery by plaintiffs who were victims of a hostile work environment but who were not constructively discharged) (quoting Landgraf v. USI Film Prods., 511 U.S. 244, 283 (1994)).  Thus, Nalepa may proceed to trial on her hostile work environment claim despite the failure of her constructive discharge claim at the summary judgment stage.

to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." Id. at 2442 (quoting Ellerth, 524 U.S. at 761). In these circumstances, it is appropriate to hold the employer strictly liable. Id.

When a supervisor's harassment does not culminate in a tangible employment action, the employer still may be held vicariously liable for the supervisor's creation of a hostile work environment if the employer is unable to establish an affirmative defense. Id. Specifically, the employer "can mitigate or avoid liability by showing (1) that it exercised reasonable care to prevent and promptly correct any harassing behavior and (2) that the plaintiff unreasonably failed to take advantage of any preventive or corrective opportunities that were provided." Id. This framework "accommodate[s] the agency principles of vicarious liability for harm caused by misuse of supervisory authority, as well as Title VII's equally basic policies of encouraging forethought by employers and saving action by objecting employees." Id. (quoting Ellerth, 524 U.S. at 764). When the alleged harasser is not a supervisor, the employer is directly liable for the employee's alleged harassment if the employer was negligent with respect to the offensive behavior. Id. at 2441.

The Supreme Court has held that, for purposes of vicarious liability under Title VII, "an employee is a 'supervisor' . . . if he or she is empowered by the employer to take tangible employment actions against the victim." Id. at 2454. Here, Jolley disputes that Pletcher was Nalepa's "supervisor" under this definition. Specifically, Jolley contends that, although Pletcher oversaw Plaintiff's day-to-day work, he did not have the authority to take tangible employment actions such as hiring, firing, or disciplining employees. See ECF No. 23 at 14 (citing Def.'s Statement Mat. Facts ¶¶ 9-11). After careful review, I cannot resolve this issue as a matter of law at this juncture because there are genuine factual disputes about the scope of Pletcher's authority within Jolley. Among other things, Nalepa cites evidence that Pletcher was given the title of Chief Operations Officer ("COO") and held himself out as both COO and President of

Jolley after Mr. and Mrs. Jolley retired; that Pletcher both hired and fired specific employees during Nalepa's tenure; and that Pletcher's responsibility for the day-to-day operations of Jolley included significant involvement in personnel decisions there.    See Pl.'s Resp. to Def.'s Statement Mat. Facts ¶¶ 5-12 (and evidence cited therein).    Accordingly, Jolley's motion for summary judgment as to Pletcher's supervisory status is denied.

Because Nalepa has not alleged any tangible employment action in this case, Jolley cannot be held strictly liable under the Faragher/Ellerth standard.  Thus, I must decide whether, as a matter of law, Jolley has established the Faragher/Ellerth affirmative defense – i.e., that (1) it exercised reasonable care to prevent and promptly correct any harassing behavior and (2) that the plaintiff unreasonably failed to take advantage of any preventive or corrective opportunities that were provided.[8]    Again, after careful review of the record, I find that genuine issues of material fact preclude summary judgment on this issue.  For example, although Jolley has produced a copy of an employee handbook containing a sexual harassment policy [ECF No. 25-1, Ex. 2], Nalepa has offered testimonial evidence that she and other sales employees were never shown that handbook and/or policy.  Pl.'s Resp. to Def.'s Statement Mat. Facts [ECF No. 31] ¶¶ 20-22.  Nalepa also has supplied evidence that there was no individual to whom she could reasonably have made a complaint regarding Pletcher during the time of his alleged harassment.  Id.  Although Jolley disputes Nalepa's testimony on these points, this disagreement merely highlights that these are genuine issues of material fact appropriately resolved by the fact-finder at trial.

For all of these reasons, summary judgment on the issue of vicarious liability is denied.

---

[8] Nalepa also argues that the Faragher/Ellerth affirmative defense is per se unavailable to Jolley because Pletcher was a high-level corporate officer of Jolley and, thus, his actions are directly imputable to Jolley under an alter-ego theory.  See Pl.'s Opp. Br. at 17-18 (citing cases).  Even if this is a viable theory, it again is predicated on facts concerning Pletcher's role at Jolley that remain in dispute at this juncture.

**E. Retaliation**

The anti-retaliation provision of Title VII provides:

> It shall be an unlawful employment practice for an employer to discriminate against any of his employees . . . because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding or hearing under this subchapter.

42 U.S.C. § 20003-3(a).  Nalepa alleges that Jolley unlawfully retaliated against her by harassing her because she opposed discrimination and disparaging her after her separation from employment.  Compl. ¶¶ 54, 59.  In particular, Nalepa contends that after she tendered her resignation, Pletcher harassed her while she was training her replacement, exacerbating her panic attacks and causing her to take paid time off.  Id. ¶ 43.  Nalepa also avers that Pletcher said "untrue and malicious" things about her and her separation to others in the industry, including possible employers and sales contacts.  Id. ¶ 45.  When asked at her deposition to elaborate on this latter statement, Nalepa testified that a sales representative named Ed McKee called her after her resignation and told her that Pletcher was saying "a lot of nasty things" about her to him.  Nalepa Dep. [ECF No. 25-1] at 159-62.  Jolley argues that Nalepa's retaliation claims cannot survive summary judgment because she has not offered any evidence to support the allegations in her Complaint.

After careful consideration, I agree that Nalepa fails to mount a meaningful response to Jolley's arguments in favor of summary judgment on her retaliation claim.  As an initial matter, Nalepa's opposition brief does not even mention the allegation that Pletcher harassed her after she tendered her resignation, let alone point to evidence to support that allegation.  When asked about this contention at her deposition, Nalepa replied that she did not remember how Pletcher harassed her after she resigned or whether he even did so.  Nalepa Dep. at 130, 156-57.

With respect to Nalepa's allegation that Pletcher said "a lot of nasty things" to Ed McKee about her, Nalepa cites only one case, Robinson v. Shell Oil Co., 519 U.S. 337 (1997), in

support.  <u>Robinson</u>, however, simply stands for the proposition that Title VII's anti-retaliation provision encompasses retaliation against former employees.  519 U.S. at 346.  It does not absolve Nalepa's failure to point to sufficient evidence supporting the application of the law to the facts in this case.  Among other things, Nalepa fails to point to any evidence, other than her own self-serving deposition testimony, that Pletcher ever disparaged her to Mr. McKee.  Both Mr. McKee, in a sworn affidavit, and Pletcher in his deposition testimony, deny Nalepa's allegations.  <u>See</u> ECF No. 25-6 (McKee Affidavit), ECF No. 25-2 (Pletcher Dep. at 168-69). Nalepa never deposed Mr. McKee and was unable to recall in her deposition exactly what "nasty things" Pletcher allegedly had said about her.  Nalepa Dep. at 159-62.  Moreover, Nalepa admitted that Mr. McKee was only a sales contact, not a potential employer, and that she believed he would continue to work with her if given the opportunity.  <u>Id.</u>

Because Nalepa has failed to support her retaliation claims with sufficient evidence, summary judgment on those claims is appropriate, and Jolley's motion for summary judgment on the retaliation claims is granted.

## III. <u>CONCLUSION</u>

For all of these reasons, Defendant's Motion for Summary Judgment is granted as to Nalepa's constructive discharge and retaliation claims and denied in all other respects.

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

Misty Nalepa,                              )
                                           )
                Plaintiff,                 )
                                           )
        vs.                                )        Civil Action No. 14-41
                                           )
Jolley Industrial Supplies Company, Inc., )
                                           )
                Defendant.                 )
                                           )

AMBROSE, Senior District Judge

## ORDER OF COURT

AND NOW, this 29th day of March, 2016, after careful consideration of the submissions of the parties and for the reasons set forth in the Opinion accompanying this Order, it is ordered that Defendant Jolley Industrial Supplies Company, Inc.'s Motion for Summary Judgment [ECF No. 22] is granted in part and denied in part as follows: the Motion is granted as to Plaintiff's constructive discharge and retaliation claims and denied in all other respects.

It is FURTHER ORDERED that counsel attend a pretrial/settlement conference scheduled for April 5, 2016, at 11:00 a.m. before the undersigned in Courtroom 3B of the U.S. Courthouse, 700 Grant Street, Pittsburgh, Pennsylvania. Counsel shall have settlement authority, and parties are to be either present or available by telephone.

BY THE COURT:

/s/ Donetta W. Ambrose
Donetta W. Ambrose
Senior U.S. District Judge